UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARIE PERRY,

    Plaintiff,

             Case Number 12-11068
v.              Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____ /

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING JUDGMENT OF ADMINISTRATIVE LAW JUDGE**

This case arises out of an application for social security benefits filed by Plaintiff Marie Perry. Defendant Commissioner of Social Security concluded that Plaintiff is not disabled and denied the application. Plaintiff requested a hearing before an administrative law judge, and received one before Administrative Law Judge McClain. He too denied Plaintiff's application.

Plaintiff then appealed to this Court. The gravamen of her complaint is that Judge McClain erred in not finding Plaintiff's testimony more credible than conflicting medical evidence in the record.

The case was referred to Magistrate Judge Randon for general case management. Both parties filed cross-motions for summary judgment. Addressing the motions, Magistrate Judge Randon issued a report recommending that the Court deny Plaintiff's motion, grant Defendant's motion, and affirm Judge McClain's decision.

Any party may file written objections to a report and recommendation. 28 U.S.C. § 636(b)(1). The district court "shall make a de novo determination of those portions of the report

. . . to which objection is made." *Id.* The Court is not obligated to further review the portions of the report to which no objection was made. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

Plaintiff objected to the report and recommendation, succinctly reasserting that "medical evidence does not support [Judge McClain's] credibility determination. As [Judge Randon] adopted [Judge McClain's] reasoning, plaintiff objects." Pl's Objection 3, ECF No. 13.

For reasons detailed below, the Court concludes that substantial evidence does support Judge McClain's meticulously detailed, carefully reasoned decision. The Court will overrule Plaintiff's objection, adopt Judge Randon's report and recommendation, deny Plaintiff's motion, grant Defendant's motion, and affirm the decision of Judge McClain.

# I

## A

The Court reviews the Commissioner's decision to determine whether the "factual findings . . . are supported by substantial evidence." *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) (citing 28 U.S.C. § 405(g)). "Substantial evidence," the Sixth Circuit instructs, "is more than a scintilla of evidence but less than a preponderance." *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). That is, it "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Sixth Circuit cautions that the Commissioner's "findings based on the credibility of the applicant are to be accorded great weight and deference." *Walters v. Comm'r.*, 127 F.3d 525, 531 (6th Cir. 1997). If the Commissioner's decision (including the assessment of the claimant's credibility) is supported by

-2-

substantial evidence, it must be affirmed, even if substantial evidence supports the opposite conclusion. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

## B

The Commissioner's decision is made according to a five-step process.  20 C.F.R. § 404.1520(a)(4)(i)–(v).  A claim is allowed when it is demonstrated that: (1) the claimant is not engaged in "substantial gainful employment"; (2) the claimant suffers from a severe impairment which has lasted or is expected to last for twelve continuous months; (3) the impairment meets or is equal to one of the enumerated impairments; (4) ;  the claimant does not retain the "residual functional capacity" to perform his "past relevant work"; and (5) the claimant is unable to perform any other gainful employment in light of the claimant's "residual functional capacity, age, education, and work experience."  20 C.F.R. § 416.920(a)(4)(i)–(v).

The claimant has the burden of proof through the first four steps.  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 C.F.R. § 404.1520 (1982)).  If the analysis reaches the fifth step, the burden transfers to the Commissioner.  *Id.*

## II

## A

Plaintiff is a 50-year-old woman.  A divorced mother of two, Plaintiff completed the 12th grade.  R. at 297–98.  For 17 years, Plaintiff reports, she worked as an assistant manager at McDonalds (that employment ended in 2004).  *See* R. at 298.  She further reports that she worked as a bookkeeper and accountant for five years with her former husband's auto repair business.  R. at 142.  And she also worked in a clerical position for a construction company, as a waitress at a restaurant, and as cashier and food preparer at a fast food restaurant.  R. at 142.

Plaintiff applied for disability benefits on August 19, 2008.  R. at 117.  She listed the conditions that limited her ability to work as: "Liver and kidney disease, nerve damage both hands."  R. at 141.  She became unable to work because of these disabilities, Plaintiff asserted, on April 18, 2008.  R. at 141.

The evidence regarding Plaintiff's medical history, employment history, and credibility, however, begins the year before.  And so that is where this Court's chronological review of the evidence begins.

## B

2007.

### 1

In June, Plaintiff was released from prison.[1]  R. at 298.  (She had been incarcerated from October 2005 through June 2007 for her a third conviction of operating a motor vehicle while under the influence of alcohol.  R. at 298.)  She began working at Taco Bell.  *See* R. at 142, 298.

In October, Plaintiff saw her primary care physician, Dr. Rosemarie Thomas, complaining of hand pain and anxiety.  R. at 281–82.  (Several of Plaintiff's fingers had been badly injured years before in an automobile accident.  *See* R. at 282.)  For the hand pain, Dr. Thomas prescribed ibuprofen and  recommended "warm soaks."  R. at 282.  For the anxiety, Dr. Thomas prescribed Xanax.  R. at 282.

---

[1] Plaintiff also reports "being in jail seven times for possession, shoplifting and embezzlement."  R. at 298. As an aside, it should be noted that the Federal Rules of Evidence do not apply in Social Security administrative hearings.  *See* 20 C.F.R. § 416.1450(c) ("The administrative law judge may receive evidence at the hearing even though the evidence would not be admissible in court under the rules of evidence used by the court.").  Nevertheless, their principles — including that of Rule 609 — are "instructive."  *Slover v. Comm'r*, CV-10-258-HZ, 2011 WL 1299615, at *7 (D. Or. Apr. 4, 2011).

-4-

The following month, Plaintiff returned to see Dr. Thomas.  R. at 277–78.  The doctor noted Plaintiff's anxiety was "much improved on Xanax."  R. at 278.  (Plaintiff made no complaint regarding her hands.  *See* R. at 278.)

On December 26, Plaintiff again returned to see Dr. Thomas.  R. at 275.  Plaintiff was tearful and agitated.  R. at 275.  She was depressed, she told Dr. Thomas.  R. at 275.  Dr. Thomas prescribed Celexa and told Plaintiff to continue taking Xanax as needed.  R. at 275.

About this time, Plaintiff's employment at Taco Bell ended.  *See* R. at 142, 298.

**2**

2008.

**a**

Valentine's day.  Plaintiff went to Dr. Thomas, complaining of injured ribs and stress.  R. at 273.  Plaintiff reported that she hurt her ribs when she fell down the stairs.  R. at 273.  Dr. Thomas's notes report that Plaintiff "had been drinking."  R. at 273.  Tearful and agitated, Plaintiff also reported that her mom was in the hospital and her friend died.  R. at 273.  Dr. Thomas prescribed medication for Plaintiff's ribs, increased her Xanax prescription, and told her to go to Alcoholics Anonymous.  R. at 273.

On February 24, Dr. Thomas saw Plaintiff again.  R. at 272.  Plaintiff told Dr. Thomas that her ribs were still sore but that she had stopped drinking.  R. at 272.

**b**

Four days later, however, Plaintiff was admitted to the Oakdale Recovery Center in need of alcohol detoxification.  R. at 176–97.  The detoxification took three days.  R. at 176.  She stayed 21 days in all.  R. at 176.  Plaintiff's discharge summary reported that her attention,

concentration, anxiety, depression, impulsivity, mood swings, and substance abuse as "improved."  R. at 179.

Shortly after leaving Oakdale Recovery Center, Plaintiff returned to see Dr. Thomas.  R. at 271.  Plaintiff continued to complain of depression; Dr. Thomas told her to keep taking Celexa.  R. at 271.

### c

On April 28, Plaintiff went to the Huron Valley Sinai Hospital with abdominal pain, nausea, and vomiting.  R. at 198–212.  Her chart reflects that Plaintiff told her doctors that "she was taking about six extra-strength Tylenol for three days."  R. at 199.  The chart continues: "Tylenol level was normal. . . . [T]he patient as a historian is unreliable."  R. at 199.

Doctors initially found that Plaintiff had elevated liver enzymes.[2]  R. at 198–99.  And her condition continued to worsen over the next 12 hours.  R. at 198–99.  Concerned about the risk of liver failure, the doctors transferred Plaintiff to Henry Ford Hospital later that day.  R. at 198.  "The patient may require liver transplantation," the discharge instructions cautioned.  R. at 198.

### d

At Henry Ford, Plaintiff received treatment for "[a]cute liver injury secondary to acetaminophen toxicity on top of chronic alcohol abuse."[3]  R. at 215; *see* R. at 213–53 (Henry Ford Records).  And though the initial prognosis was "poor," R. at 242, her condition improved

---

[2] "Elevated liver enzymes," The May Clinic reports, "may indicate inflammation or damage to cells in the liver. . . .  In most cases, liver enzyme levels are only mildly and temporarily elevated."  Mayo Clinic Staff, *Elevated Liver Enzymes* (May 5, 2011), *available at* http://www.mayoclinic.com/health/elevated-liver-enzymes/MY00508.

[3] "Acetaminophen toxicity" is also referred to as Tylenol poisoning.  *See generally* U.S. Food and Drug Administration, *Acetaminophen Toxicity* (Jan. 31, 2013) (collecting information), *available at* http://www.fda.gov/drugs/drugsafety/ucm230396.htm.

-6-

with time.  *See* R. at 215.  Her liver enzymes stabilized, and then began trending downwards.  R. at 215.  Her abdominal pain, nausea, and vomiting also improved.  R. at 215.  Her mental health likewise "improved and normalized."  R. at 215.

Seven days after being transferred to Henry Ford, Plaintiff was discharged.  R. at 215. The discharge summary noted that it was a "routine discharge."  R. at 215.

Plaintiff was instructed to follow up with her regular physician.  R. at 216.

**e**

Plaintiff followed up with Dr. Thomas three days later.  Diagnosing Plaintiff with chemical hepatitis caused by alcohol abuse and acetaminophen,[4]  Dr. Thomas ordered lab work done.  R. at 265.

Reviewing the lab results a couple weeks later, Dr. Thomas found that Plaintiff's condition was improving.  R. at 262.  Dr. Thomas advised Plaintiff to avoid acetaminophen.  R. at 262.  About two months passed without incident.

In August, Plaintiff returned to Dr. Thomas complaining of swollen hands, tingling in the arms, dizziness, and vomiting.  R. at 258.  Dr. Thomas diagnosed Plaintiff with carpal tunnel syndrome and gastroenteritis.[5]  R. at 258.  She prescribed wrist braces, rest, and fluids.  R. at 258.

---

[4] Chemical hepatitis (or "toxic hepatitis"), the Mayo Clinic reports, "is an inflammation of your liver in reaction to certain substances to which you're exposed. . . .  The symptoms of toxic hepatitis often go away when exposure to the toxin stops.  But toxic hepatitis can permanently damage your liver, leading to irreversible scarring of liver tissue (cirrhosis) and in some cases to liver failure."  Mayo Clinic Staff, *Toxic Hepatitis* (Dec. 17, 2010), *available at* http://www.mayoclinic.com/health/toxic-hepatitis/DS00811.

[5] "Carpal tunnel syndrome," the U.S. National Library of Medicine explains, "is a condition in which there is pressure on the median nerve — the nerve in the wrist that supplies feeling and movement to parts of the hand.  It can lead to numbness, tingling, weakness, or muscle damage."  U.S. National Library of Medicine, *Carpal Tunnel Syndrome* (Nov. 19, 2012), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001469/. "Gastroenteritis," in turn, "is an inflammation of the lining of the intestines caused by a virus, bacteria or parasites.

**f**

As noted, in August 2008 Plaintiff also applied for Social Security benefits.   The Michigan Department of Human Services directed Plaintiff to see several doctors.

**i**

The first to see her was Dr. Zehra Noorani, who saw Plaintiff in September for a "comprehensive medical examination."  R. at 254.  After conducting the exam, Dr. Noorani reported that Plaintiff's neck, back, extremities, and musculoskeletal areas were all normal.  R. at 255.  And Plaintiff did not exhibit tenderness in those areas.  R. at 255.  But, Dr. Noorani noted, Plaintiff should nevertheless undergo an electromyography (EMG) of her upper extremities and a CT scan of her liver.  R. at 256.  Finally, Dr. Noorani also reported that Plaintiff's mood was "anxious."  R. at 255.

**ii**

The Michigan Department of Human Services also directed Plaintiff to Dr. Mary Wood for a consultation.  R. at 285–89.  In November, Dr. Wood saw Plaintiff.  R. at 285.

The physical exam revealed Plaintiff's neck was "[w]ithin normal limits."  R. at 288. The liver was palpable, but there was no tenderness.  R. at 288.  The musculoskeletal system had "no striking abnormalities."  R. at 288.  And Plaintiff had full motion of both wrists and all fingers.  R. at 288.

---

Viral gastroenteritis is the second most common illness in the U.S. . . .  Most people recover with no treatment." U.S. National Library of Medicine, *Gastroenteritis* (Mar. 3, 2013), *available at* http://www.nlm.nih.gov/medlineplus/gastroenteritis.html

Concluding the examination, Dr. Wood diagnosed Plaintiff with: (1) "Hepatomegaly from Tylenol toxicity and ethanol abuse";[6] (2) asthma; and (3) depression.  R. at 288.

### iii

Also in November, Plaintiff underwent a psychological consultation with Drs. John Jeter and Hugh Bray.  R. at 297–99.

Discussing her background, Plaintiff told the doctors that her drug and alcohol history included: (1) drinking alcohol every day for 27 years ("30 out of 30 days" from 1980 to 2007); (2) using cannabis occasionally for 24 years (from 1979 to 2003); (3) using crack cocaine every day for six years ("30 out of 30 days" from 1994 to 2000); and (4) using powder cocaine occasionally for three years (from 1979 to 1981).  R. at 298.

Turning to the present, Plaintiff told the doctors that her daily activities included "housekeeping and shopping.  She attends church. . . .  She does laundry, cashes checks, pays bills and cooks simple meals. . . .  She completes her own dressing, hygiene, bathing and grooming.  She sometimes watches TV.  She takes walks, exercises, reads, visits and socializes."  R. at 297.

Drs. Jeter and Bray, in turn, found Plaintiff to be a pleasant woman.  R. at 298–99.  They reported: "Overall, the patient presented as cooperative, motivated and verbally responsive. . . .  Thoughts are logical, organized, simple and concrete.  Content of communication is age appropriate.  Mood is depressed and anxious. . . .  Contact with reality is good. . . .  Motor activity is within normal limits."  R. at 298.

---

[6] "Hepatomegaly," the U.S. National Library of Medicine explains, "is swelling of the liver beyond its normal size."  U.S. National Library of Medicine, *Hepatomegaly* (May 22, 2011), *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003275.htm.

Summarizing their findings, the doctors concluded: "The patient presents as generally anxious.  Depression with medication is mild.  She is pleasant, affect is mildly blunted occasionally.  She smiles easily as she discusses her circumstances."  R. at 299.

### iv

On November 18,  an examiner for the Michigan Disability Determination Service, Dr. Russell Holmes, evaluated Plaintiff's "physical residual functional capacity."  R. at 302–08.  He found that Plaintiff could: (1) occasionally lift and carry 50 pounds; (2) frequently lift and carry 25 pounds; (3) stand and walk for about six hours in an eight-hour workday; (4) sit for about six hours in an eight-hour workday; (5) and push and pull without restriction.  R. at 303.

### v

Four days later, another examiner for the Michigan Disability Determination Service, Dr. Leonard Balunas, evaluated Plaintiff's "mental residual functional capacity."  R. at 310–13.  He found that Plaintiff was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; and (2) maintain attention and concentration for extended periods.  R. at 310.  Plaintiff scored at the highest level in all other categories, and no other limitations on her mental abilities were reported.  R. at 310.

### g

Also in November, Defendant denied Plaintiff's claim for disability benefits, explaining: "Based on a review of your health problems you do not qualify for benefits on this claim."  R. at 74.  Defendant elaborated: "You said that you were disabled because of Liver and kidney disease, nerve damage both hands.  Your liver and kidney problems have improved.  You are able to walk and move well to care for yourself."  R. at 74.

-10-

Plaintiff filed a request for a hearing before an administrative law judge a short time later. R. at 78–80.  (That hearing, as discussed below, was held in September 2010.)

### 3

2009.

### a

In March, Plaintiff underwent an EMG performed by Dr. Xi Guo.  R. at 330–32.  Motor nerve conduction studies showed a "significant slowing of ulnar motor conduction velocities across both elbows."  R. at 330.   Dr. Guo continued: "There is electrodiagnostic evidence of moderate degrees of carpal tunnel syndrome affecting the bilateral upper extremities.  There is also electrodiagnostic evidence of moderate degrees of ulnar neuropathy across both elbows."[7] R. at 330.

### b

In July, Plaintiff underwent an MRI of her cervical spine.  R. at 333–35.  Dr. Richard Krikorian interpreted the image, concluding: "There is disc desiccation and disc space narrowing at all levels of the cervical spine. . . .  [T]here is a combination of osteophytic spurring broad-based disc bulge[8] at C8 03/04 level which results in some mild canal stenosis[9] . . . .  There is a

---

[7] Ulnar neuropathy "is a problem with the nerve that travels from the shoulder to the hand.  This is called the ulnar nerve.  It helps you move your hand and wrist."  U.S. National Library of Medicine, *Ulnar Nerve Dysfunction* (Aug. 28, 2012), *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000789.htm.

[8] "Osteophytic spurs," or bone spurs, "are bony projections that develop along the edges of bones.  Also called osteophytes, bone spurs often form where bones meet each other — in your joints.  Bone spurs can also form on the bones of your spine. . . .  Most bone spurs cause no symptoms and may go undetected for years.  Bone spurs may not require treatment.  Decisions about treatment depend on where spurs are located and how they affect your health."  Mayo Clinic Staff, *Bone Spurs* (Mar. 7, 2012), *available at* http://www.mayoclinic.com/health/bone-spurs/DS00627.

[9] "Spinal stenosis," the Mayo Clinic explains, "is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often

-11-

combination of osteophytic spurring broad-based disc bulge present at the C4-5 and C5-6 and C6-7 levels  which also results in mild flattening the anterior thecal sac without significant canal stenosis or cord effacement at these levels."  R. at 333.  Dr. Krikorian also noted that Plaintiff's "cervical spinal cord has a normal signal intensity."  R. at 333.

c

Sometime prior to October 2009, Dr. Thomas moved, so Plaintiff needed a new primary care physician.  See R. at 337.  In October, Plaintiff found one, Dr. Marjorie Alvir.  R. at 337.

Dr. Alvir gave Plaintiff a physical exam, which was normal (aside from a "harsh lung sound"[10]) R. at 337.  For example, her neck was "supple"; her abdomen, "nontender and nondistended"; and her affect, "appropriate."  R. at 337.

Plaintiff returned to Dr. Alvir on November 10, complaining of a cough.  R. at 339.  Dr. Alvir prescribed antibiotics (Azithromycin) and told Plaintiff to take over-the-counter decongestants and expectorants as needed.  R. at. 339.

Dr. Alvir also recorded some notes regarding Plaintiff's mental health at this visit.  R. at 339.  "She is currently taking Xanax three times a day," Dr. Alvir noted, continuing: "She states she is having several panic attacks per day. . . .  She denies any suicidal or homicidal thoughts although sometimes she thinks that she is ready to be done with her life.  She does not have any plans."  R. at 339.

---

in the neck and lower back.  While some people have no signs or symptoms, spinal stenosis can cause pain, numbness, muscle weakness, and problems with bladder or bowel function."  Mayo Clinic Staff, *Spinal Stenosis* (June 28, 2012), *available at* http://www.mayoclinic.com/health/spinal-stenosis/DS00515.

[10] Plaintiff reported smoking half a pack of cigarettes per day.  R. at 337.  She also told Dr. Alvir that she was "interested in smoking cessation . . . .  We will discuss this issue again on a future visit."  R. at 337.

On November 30, Plaintiff again returned to Dr. Alvir, complaining of a cough and anxiety. R. at 340. Again, Dr. Alvir treated the cough. R. at 340.

**d**

On December 14, Plaintiff consulted Dr. Karen Park with St. Joseph Mercy Pain Institute. *See* R. at 372–408 (St. Joseph Mercy Pain Institute records). Plaintiff complained of "aching pain in my neck, both arms and hands burning numbness and shooting pains." R. at 405.

Dr. Park's physical examination revealed that Plaintiff had "deep tendon reflexes which are normal of the upper extremity. She had shoulder pain with shoulder abduction. Her neck extension was also limited. She had minimal neck extension. She had difficulty turning her head to the left and sensations obtained with that movement as well as pain. . . . Her motor strength was actually decreased equally bilaterally, both with biceps and triceps motion." R. at 406.

Dr. Park concluded that Plaintiff had "symptoms that are consistent with possible neck involvement. It is worth trying one [epidural steroid] injection." R. at 406.

**4**

**2010.**

**a**

On January 4, Plaintiff returned to see Dr. Park. R. at 394–97. Dr. Park diagnosed Plaintiff with cervical spondylosis.[11]   And as proposed the previous December, Dr. Park

---

[11]  "Cervical spondylosis," the U.S. National Library of Medicine reports, "is a disorder in which there is abnormal wear on the cartilage and bones of the neck . . . . Many people with this problem are able to maintain active lives. However, some patients will have to live with chronic pain." U.S. National Library of Medicine, *Cervical Spondylosis* (June 4, 2011), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001472/.

administered an epidural steroid injection.  R. at 394.  Dr. Park also told Plaintiff to return in several weeks for a second injection.  R. at 394.

Plaintiff came to Dr. Park again on February 24.  R. at 383–86.  Plaintiff reported that she had received a "definite benefit for a couple weeks after the injection that was done in January." R. at 383.  Again, she received an epidural steroid injection.  R. at 383.  And again, she was instructed to return (if needed) for another injection.  R. at 383.

**b**

In March, Plaintiff saw Dr. Advir, complaining of a cold and cough.  R. at 344.  Dr. Advir reported: "Affect is appropriate.  Patient appears mildly anxious but no acute distress.  She does become tearful at times during the visit when she talks about her mom."  R. at 344. (Plaintiff's mother had died unexpectedly two weeks earlier.  *See* R. at 344, 383.)

After physically examining Plaintiff, Dr. Advir reported: "Neck supple. . . .  5/5 strength bilateral [upper extremities and lower extremities].  Gait stable."  R. at 344.  Dr. Advir diagnosed Plaintiff with acute sinusitis,[12] giving her a prescription for Robitussin with codeine.  R. at 344.

**c**

In April, Plaintiff returned to Dr. Park for a third injection.  R. at 372–77.  "She reports definite benefit from the injection," Dr. Park again recorded in her notes, continuing: "She has had a lot of deaths in her family.  Her mother died sometime in February.  She has also had a mother-in-law and brother-in-law pass away.  She has also had abusive effects from her significant other and is no longer in that relationship.  She is very weepy.  She reports that she did take six Valium at one point in a suicide attempt since she was seen."  R. at 372.  Dr. Park

---

[12] "Sinusitis is inflammation of the sinuses."  U.S. National Library of Medicine, *Sinusitis* (July 30, 2012), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001670/.

also noted: "This completes our series of injections.  She could return if needed in July."  R. at 372.

### d

On June 3, Plaintiff was brought to see Dr. Advir "by her friend, Jeff."  R. at 350.  Jeff, Dr. Advir learned, had brought Plaintiff to the emergency room the previous week.  See R. at 350.  "We do not have any documents from this visit," Dr. Advir observed in her notes, continuing: "I did talk to her friend, Jeff, and he states that she was sent there by her counselor. He states that she was found to have a high blood alcohol level.  He states that the patient has periods of binging and then periods where she does not drink."  R. at 350.

Turning to what Plaintiff herself said, Dr. Advir wrote: "Patient states that she continues to grieve over her deceased mother. . . .  She denies drinking or using any illicit drugs.  Patient denies any suicidal or homicidal thoughts."  R. at 350.

Describing Plaintiff's conduct, Dr. Advir wrote: "Patient is crying throughout the exam and seems angry at times.  She is incoherent and unable to finish sentences."  R. at 350.  Dr. Advir concluded: "I told the patient that she seems to have a problem with alcohol abuse and that she needs help."  R. at 350.

### e

In a follow-up conversation on June 28, Plaintiff reported that she "is doing great!"  R. at 351.  She further reported that she was no longer drinking.  R. at 351.

About two months passed.  Then the hearing before the administrative law judge came.

-15-

**C**

On September 9, 2010, Plaintiff appeared for a video hearing before Administrative Law Judge Lantz McClain. *See* R. at 40–65 (transcript).

**1**

Plaintiff was the first to testify. Asked why she had stopped working, Plaintiff responded: "I had an accident, fell down some stairs. . . and I broke some ribs, fractured some and I was put on Vicodin and the Vicodin made me very sick. So I started taking just regular extra-strength Tylenol and my body became toxic to acetaminophen and shut my kidneys and my liver down." R. at 45.

Enumerating what physical ailments she had (other than "the liver problems"), Plaintiff testified: "I suffer from deteriorating disks in my c-spine. Cubical tunnel syndrome in both arms and carpal tunnel in both arms. I suffer from post traumatic stress disorder, major depression, high anxiety and stress." R. at 46.

The pain, Plaintiff also testified, was constant: "It's pretty much the same every day." R. at 52. "I wake up to where I can't feel my hands," she continued, explaining: "I can't drink a cup of coffee. . . . I'll have to wait at least an hour when I, before I get up before I can even hold the cup and I have to hold it with two hands because one hand won't hold the cup." R. at 52–53.

Discussing her stamina, Plaintiff testified: "I can stand for a, not a very long period of time because then my legs start going numb for some reason. . . . I might be able to stand and maybe do something, something in the kitchen for maybe at the most 45 minutes, at the most, and that's pushing it for me. I have to go sit down." R. at 48. Turning to her dexterity, she continued: "I cannot grip, grasp, or pull. . . . I can't button anything." R. at 51.

She was also limited in her ability to do household chores, Plaintiff reported, elaborating: "I can do a bit of laundry, my, mostly just my own, my son has been helping me. I can't vacuum. I can dust a little bit with a Swiffer duster thing." R. at 46. Asked whether she was able to shop for groceries, Plaintiff testified: "I hold onto the cart and I just go there and get a few things that I would like and then I just say, it's time to go." R. at 49.

Asked "what you basically do during the day?" Plaintiff answered: "I read. I try to cook a little because cooking is one of my favorite things. I try to, I try to stay busy doing stuff as much stuff as I can do and then I go and lay down." R. at 52.

Plaintiff was also asked how often she had anxiety attacks, responding: "I'm having one right now. . . . I feel overwhelmed, stressed out — I just feel like I'm useless in a way." R. at 53–54. Finally, responding to how her depression affected her, Plaintiff explained: "Mentally and sometimes I just wonder why I'm here, still here and I really — to just suffer through this pain, I don't know." R. at 54.

**2**

Next to testify was a vocational expert, Lisa Cox. R. at 60–63. Judge McClain asked Ms. Cox to assume that a hypothetical person shares Plaintiff's age, education, and vocational experience and: (1) can perform no more than limited, light work involving simple, repetitive tasks; (2) can frequently carry 10 pounds and occasionally carry 20 pounds; (3) can sit, stand, and walk six hours in an eight-hour workday; and (4) can frequently, but not constantly, use her hands, but not for repetitive tasks. R. at 61–62. Ms. Cox was further to assume that the hypothetical person has to avoid concentrated exposure to dust and perfume. R. at 62. With

-17-

these assumptions, Ms. Cox was asked whether the hypothetical person was capable of performing a significant numbers of jobs in the regional or national economy.  R. at 62.

Answering in the affirmative, Ms. Cox responded that such a person could, for example, work as a "cashier II" (104,800 available jobs in Michigan; 3,439,380 jobs nationally) and motel housekeeper (24,670 available jobs in Michigan; 887,890 jobs nationally).  R. at 62.

Changing the hypothetical, Judge McClain next asked Ms. Cox to assume that a hypothetical person has all of the limitations that Plaintiff had identified in her testimony.  R. at 62.  "Any jobs?" asked Judge McClain.  R. at 62.  "No," responded Ms. Cox.

**3**

Finally, Plaintiff's counsel made a brief closing statement at the hearing.  R. at 63–64. He explained that Plaintiff's "combination of impairments rather than meeting a listing is what precludes her from work activity.  The physical RFC in the file seemed to assume that the examiner was just going on the fact that she had the allergic reaction and it wouldn't last a month and indicating that she could lift 50 pounds would not seem credible considering her diagnosed carpal tunnel as well as her neck injury.  The medical records support her physical problems and her testimony's credible so we would ask the Court to adopt a second hypothetical and find her disabled." R. at 64.

**E**

In October 2010, Judge McClain issued a decision denying Plaintiff's application for disability benefits.  R. at 13–29.  Appling the five-step disability analysis to Plaintiff's claim, at step one Judge McClain found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date.  R. at 15.  At step two, Judge McClain found that Plaintiff had "the

following severe impairments: history of acute liver failure, asthma, bilateral carpal tunnel syndrome and cubital syndrome,[13] status post injury to left hand, degenerative disc disease of the cervical spine,[14] depression and anxiety." R. at 15.  At step three, Judge McClain concluded that Plaintiff's combination of impairments did not meet or equal one of the impairments listed in the regulations.  R. at 16.

Between steps three and four, Judge McClain found that Plaintiff had the residual functional capacity to perform "light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)."[15]  R. at 18.  Judge McClain elaborated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimants statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

---

[13] Carpal tunnel syndrome has been discussed above.  "Cubital tunnel syndrome is the second most common peripheral nerve entrapment neuropathy in the upper limb.  It represents a source of considerable discomfort and disability for the patient, and in extreme cases may progress to loss of function of the hand." Stephen Cutts,  *Cubital Tunnel Syndrome*, 83 Postgrad Med. J. 28, 28 (2007), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2599973/.

[14] "Cervical disc degenerative disorder," the UCLA Spine Center reports, is "characterized by neck pain. This neck pain can be most prevalent when the patient is upright or moving the head and can be reduced by lying down or reclining.  Often the disc will be associated with osteophytes or bone spurs. . . .  There are different alternatives to surgery available for patients with degenerative disc disease and pain.  Avoidance of painful positions and/or use of a neck brace are all options to try to reduce tension by the affected discs.  Various pain management options including anti-inflammatory medications, steroid pills, injections around the nerves or epidurals can be tried."     UCLA     Spine     Center,     *Cervical     Degenerative     Disc     Disease*,     *available     at* http://spinecenter.ucla.edu/body.cfm?id=118 (last visited March 19, 2013).

[15] "Light work, 20 C.F.R. § 416.967(b) provides, " involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  A similar definition of light work is contained in 20 C.F.R. § 404.1567(b).

R. at 21.  Over the course of the next seven single-spaced pages, Judge McClain then went on to explain his credibility determination by meticulously detailing the medical evidence discussed above.  R. at 21–28.

At step four, Judge McClain found that Plaintiff could not perform her previous work as an assistant manager.  R. at 28.  And at step five, Judge McClain denied the application for benefits because Plaintiff could perform a significant number of jobs available in the national economy.  R. at 28.

Plaintiff requested a review by the appeals council.  *See* R. at 8.  The council declined to review Judge McClain's decision.  R. at 1–4.  This appeal followed.

## F

In March 2012, Plaintiff filed suit in this Court.  ECF No. 1.  The case was referred to Judge Randon pursuant to 28 U.S.C. § 636.  ECF No. 3.  In August 2012, Plaintiff filed a motion for summary judgment.  ECF No. 9.  Defendant then also moved for summary judgment.  ECF No. 11.

In February 2013, Judge Randon issued a report recommending that the Court deny Plaintiff's motion, grant Defendant's motion, and affirm Judge McClain's decision.  ECF No. 12.

Plaintiff filed objections to the report and recommendation.  ECF No. 13.

## III

### A

Plaintiff first makes a general objection, writing: "For the same reasons that plaintiff alleged the ALJ's decision was inaccurate, objections are made to the [report and recommendation]."  Pl.'s Objection 1.

This, however, does not qualify as "an 'objection' as that term is used in this context." *See Aldrich v. Bock*, 327 F. Supp. 2d 743, 747–48 (E.D. Mich. 2004) (Cleland, J.). As Judge Cleland explains, "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Id*. at 747. Consequently, "A general objection to the magistrate's report has the same effect as a failure to object." *Id*. at 747–48.

**B**

Next, Plaintiff objects that her testimony (supported by selected medical evidence) should have been given greater weight than the contrary medical evidence relied on by Judge McClain. Pl.'s Objection 2–3.

Plaintiff writes, for example, that medical evidence demonstrates that she suffers from "broad based disc bulges and spurring at C3-4 through C6-7 with mild canal stenosis at C3-4 to C5-6. Further as a result of her cervical problems, Ms. Perry underwent epidural steroid injections in an attempt to relieve her cervical pain. These medical exhibits support the testimony of limited activities as described by Ms. Perry." Pl.'s Objection 3 (citation omitted) (citing R. at 372, 408).

Plaintiff's objection — essentially, that greater weight should be accorded to her testimony and the medical evidence that she prefers — is unpersuasive. An administrative law judge "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). "Furthermore, the Sixth Circuit cautions, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference."

-21-

And when the administrative law judge articulates the reasons for his credibility determination, as in this case,[16] the court's review is limited to reviewing whether the Commissioner's decision is supported by substantial evidence. *Rogers v. Comm'r.*, 486 F.3d 234, 249 (6th Cir. 2007).

Here, Judge McClain's decision is supported by substantial evidence. The medical evidence demonstrates that in July 2009 Plaintiff underwent an MRI. R. at 333–35. The doctor interpreting the MRI concluded that there was "a combination of osteophytic spurring broad-based disc bulge at C8 03/04 level which results in some *mild* canal stenosis" and "a combination of osteophytic spurring broad-based disc bulge present at the C4-5 and C5-6 and C6-7 levels which also results in *mild* flattening the anterior thecal sac without significant canal stenosis or cord effacement at these levels." R. at 333 (emphasis supplied). The doctor also noted, however, a normal signal intensity of the cervical cord. R. at 333.

Four months later, Dr. Alvir gave Plaintiff a physical exam, finding her neck was "supple." R. at 337. Two months after Dr. Alvir's examination, Plaintiff was examined by Dr. Park. R. at 406. She found Plaintiff had normal upper extremity reflexes. R. at 406. But Dr. Park also found Plaintiff had limited neck extension and pain. R. at 406. So Dr. Park began treating the pain with a series of epidural injections.

After the first injection in January 2010, Plaintiff reported that she had received a "definite benefit for a couple weeks." R. at 383. After the second in February, Plaintiff again reported a "definite benefit from the injection." R. at 372.

In March 2010, Dr. Advir examined Plaintiff and reported: "Neck supple. . . . 5/5 strength bilateral [upper extremities and lower extremities]. Gait stable." R. at 344. Plaintiff

---

[16] As noted, Judge McClain explained her credibility determination by meticulously detailing the medical evidence discussed above over the course of the next seven single-spaced pages. R. at 21–28.

received a third injection in April 2010.  R. at 372.  Following that injection, Dr. Park told Plaintiff to come back in July if needed.  R. at 372.  Plaintiff did not.  On June 28, 2010, however, she told Dr. Advir that she was "doing great!"  R. at 351.

It is at this point the evidence stopped — until Plaintiff's testimony at the hearing in September 2010.  At the hearing, Plaintiff testified that "I can stand for a, not a very long period of time . . . .  I might be able to stand and maybe do something, something in the kitchen for maybe at the most 45 minutes, at the most, and that's pushing it for me.  I have to go sit down." R. at 48.  Judge McClain did not find this testimony credible, concluding that Plaintiff's "impairments, while uncomfortable to her, would not preclude her from performing light work." R. at 28.

Substantial evidence supports Judge McClain's finding.   As Judge Randon cogently observed in his report and recommendation:

> In making his credibility determination, [Judge McClain] considered Plaintiff's testimony, which included Plaintiff's daily activities; the location of Plaintiff's pain; the type of medication Plaintiff takes; treatment, other than medication, Plaintiff received for pain relief; and the measures she used to relieve her pain. . . .
>
> [Judge McClain] provided a detailed discussion of her reasons for finding that Plaintiff's subjective complaints were not fully credible.  Simply put, [Judge McClain's] credibility determination is supported by substantial evidence.

Report and Recommendation 8–9.  The Court agrees.  When the record is viewed as a whole, substantial evidence supports Judge McClain's decision that Plaintiff: (1) can perform limited, light work involving simple, repetitive tasks; (2) can frequently carry 10 pounds and occasionally carry 20 pounds; (3) can sit, stand, and walk six hours in an eight-hour workday; and (4) can frequently, but not constantly use her hands (but not for repetitive tasks).

-23-

Plaintiff's objection will be overruled.

**C**

Finally, Plaintiff objects that Judge McClain erred in crediting the medical evidence that Plaintiff "had full range of motion in wrist and fingers and gross manipulation remained intact. Further, that she retained the ability to occasionally lift 50 pounds and frequently 25 pounds. These results are contrary to other medical testing." Pl.'s Objection 3 (citations omitted) (citing R. at 29, 303, 309).

To the extent that Plaintiff is objecting that Judge McClain erred in not finding Plaintiff more credible when she testified "I cannot grip, grasp, or pull," R. at 51, for reasons discussed above her objection lacks merit.[17] Substantial evidence supports the finding that Plaintiff can perform light work. Similarly without merit is Plaintiff's objection that Judge McClain erred in finding that Plaintiff is able to occasionally lift 50 pounds and frequently 25 pounds. Judge McClain didn't. He concluded that Plaintiff can occasionally carry 20 pounds and frequently carry 10 pounds. R. at 18. Plaintiff's objection will be overruled.

**D**

In sum, Judge McClain's decision articulates the reasons for his credibility determination and is supported by substantial evidence. Accordingly, the Court will overrule Plaintiff's objection, adopt Judge Randon's report and recommendation, deny Plaintiff's motion for summary judgment, grant Defendant's motion for summary judgment, and affirm the decision of Judge McClain.

---

[17] Plaintiff herself testified that she did some light housework, cooking, and shopping. See R. at 46–52 (quoted above).

**IV**

Accordingly, it is **ORDERED** that Plaintiff's objection to Judge McClain's report and recommendation (ECF No. 13) is **OVERRULED**.

It is further **ORDERED** that the Judge McClain's report and recommendation (ECF No. 12) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment (ECF No. 9) is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 11) is **GRANTED**.

It is further **ORDERED** that the findings of the Commissioner are **AFFIRMED** and Plaintiff's complaint (ECF No. 1) is **DISMISSED**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 19, 2013


**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 19, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS